J. C. FITZPATRICK, BEN F. BELL AND FRANCES PURNELL, TRUSTEES OF THE OAK GROVE CHURCH, RESPONDENTS, v. WOODMEN OF THE WORLD LIFE INSURANCE COMPANY, A CORPORATION, APPELLANT.— 179 S. W. (2d) 753.

Kansas City Court of Appeals. April 3, 1944.

*Rainey T. Wells* and *Harding, Murphy & Tucker* for appellant.

*T. Bryant Johnson* and *Ralph P. Johnson* for respondents.

BLAND, J.—This is an action on an alleged certificate of life insurance, issued to Forest F. Foster, in favor of the Oak Grove Church and Cemetery Association, as beneficiary. The principal issue between the parties is whether the alleged certificate was ever issued and delivered to the insured by the defendant.

The facts show that Mr. Claude Manlove, a field agent of the defendant, on May 11, 1942, took the application, in Kansas City, of Dr. Forest F. Foster, for the certificate in question and, at that time. gave Dr. Foster a receipt, reciting that he had received $4.37 from the doctor in payment of one month's installment for the insurance and twenty-five cents local camp dues as payment on the "certificate for

which he has made application on this day''; that if the medical examiner should approve the application its benefits should be effective from the date of the application and, if the medical examiner or the local camp should decline the application, the amount paid should be returned to the applicant.

Dr. Foster was examined, medically, in Kansas City, by Dr. Montgomery, who was appointed by the defendant to make the examination. The application, and the report of his examination, were returned by Dr. Montgomery to Mr. Manlove, who forwarded the same to the home office of the defendant in Omaha.

In order to prove that a certificate was issued on the application, and delivered, the plaintiffs called, as a witness, Mr. Charles Purnell, who testified that he was an old friend of Dr. Foster, and was visiting with the latter in the doctor's office, in Kansas City, on June 8, 1942; that he was in the office from 4:30 P. M. until about 5:45 P. M. on that day. Over the objection of the defendant, the witness was permitted to testify that, while they were sitting in the doctor's office a ''man came into the reception room and sat down right opposite the door and Dr. Foster had a small office where we were sitting and this man sat there a few minutes and then he got up and left and he wasn't gone over five minutes I am sure, and he came back and sat down again and I told Dr. Foster that I thought this man wanted to see him and I got up and left his office and went into the reception room and this man went in and was in there a few minutes and he left. After he left Dr. Foster called me and I went in there and he handed me a policy and said, 'Here is a policy taken out for the Oak Grove Church which has just been delivered to me', and then he told me that he wanted me to see that it was carried out and he laid the papers on his desk. He didn't lock the door and we left together''. The identity of the ''man'', who called upon Dr. Foster, is not disclosed in the record.

The witness further testified that he had two pairs of glasses with him at the time in question, but only one pair with which he could read fine print and this one was in his coat in the reception room, but that he saw on the paper that the doctor handed him ''Woodmen of the World''; that the certificate consisted of ''just folded sheets of paper together''; that he opened up the certificate, but could not read the fine print, and said to the doctor: ''I can't read only that large print''; that the doctor said it was not necessary for him to get his other glasses; that the certificate was taken out ''for the Oak Grove Church to be used in improving that church''. The witness stated that, when he opened up the certificate, he could not see the fine print on the inside but he could see ''Woodmen of the World''. Later, he was shown a specimen copy of the kind of certificate, that defendant was issuing at the time of the application, alleged to have been delivered to Dr. Foster (at the top, in large print, appears the words ''WOODMEN OF THE WORLD LIFE INSURANCE SOCIETY''.) and

he was asked: "Q. And when you opened that document there that afternoon what words could you read? A. These at the top, 'WOOD-MEN OF THE WORLD LIFE INSURANCE SOCIETY'. I could read the words in large print, but I couldn't read the fine".

The application states that it was an application for membership in the "Woodmen of the World", and the report of Dr. Montgomery, submitted to the head office of defendant which was upon a printed blank furnished by defendant, is headed "Woodmen of the World". The evidence shows that, formerly, defendant's name was "Woodmen of the World", but on September 1, 1937, its name was changed to "Woodmen of the World Life Insurance Society."

The evidence shows that Dr. Foster was killed in an automobile accident. later in the day upon which he had the conversation with Mr. Purnell. Plaintiffs' evidence further tends to show that his widow and the deceased's son-in-law, on a day subsequent to the death of Dr. Foster, went to his office and found an envelope on his desk; that this envelope indicates that it was for the purpose of enclosing a certificate of insurance issued by the "Woodmen of the World," which quoted words were printed upon it. They found no certificate of insurance.

The son-in-law testified that Mr. Purnell told him about his conversation with Dr. Foster and that the witness made an effort to see Mr. Manlove at his office the second day after Dr. Foster's death, but he was told that Mr. Manlove was out of town; that he left word for the latter to call the witness, but he never called; that the witness tried to reach him three times; that he finally reached him but Manlove said there was no certificate "for the Church", and that "he knew nothing about anything of that kind"; that he told the witness that the latter would have to take the matter up with the Omaha office of the defendant; that he (Manlove) had nothing to do with it. The witness then testified that Manlove's "attitude" was "very unnatural and very evasive" but, the court struck out this testimony. The witness then testified that he finally asked Manlove if the latter would notify the Omaha office, and Manlove said that he would, but the witness did not hear from the defendant so, on July 9, 1942, he wrote a letter to it on behalf of Emma A. Foster, Executrix of the estate of Forest F. Foster, and the Trustees of the Oak Grove Church stating, that "I am hereby again notifying you of the death of Dr. Foster, and ask that you send proofs at once, to cover the *policies in force* on the life of Dr. Foster. I previously talked to Mr. Manlove of your Kansas City office and do not understand why I have not heard from you since my telephone conversation with Mr. Manlove". (Italics ours.)

In reply to this letter defendant, on July 20, 1942, wrote the witness that Dr. Foster had formerly carried three different policies with the defendant; one dated March 1, 1935, and two dated May 1, 1937 and, to the effect, that these policies had been permitted to lapse by Dr.

Foster for failure to pay the premiums thereon. There was other evidence that the doctor had a fourth certificate issued on December 4, 1938, which became suspended on September 1, 1939, by reason of his failure to make the necessary payments thereon.

The witness further testified that he never received any word from the Omaha office claiming that no certificate had been issued upon the application taken from Dr. Foster on June 8, 1942, until after this suit was filed. There is no evidence tending to show that any inquiry was made by the witness of the home office of the defendant relative to the alleged certificate in suit.

Defendant's evidence tends to show that under the constitution and by-laws and procedure of the defendant, the method of handling applications, of the kind in question, is as follows: That when an application is received in the Omaha office the secretary of the defendant refers it to the medical director of defendant, for examination; that after the application is approved by him, it is returned to the office of the secretary where the benefit certificate is issued and forwarded to the financial secretary of the local camp, who delivers it to the applicant after he has been introduced or obligated in the defendant in accordance with the requirements of the Constitution, Laws and By-laws; that the Constitution and By-laws provide that when the application is taken the applicant must pay at least one month's payment and the local camp dues for the month following the date on which the application is made, which amount is returned to the applicant if his application is rejected; that ''The liability of the Society for the payment benefits shall not begin until after the application shall have been accepted by the Medical Director''.

Defendant's assistant secretary, testifying for it, stated that the application of Dr. Foster was received in the home office, at Omaha, on May 18, 1942; that the witness referred it to the medical director; that defendant, under no circumstances, ever issues any benefit certificate without the approval of the application by the medical director; that the application was never approved by the medical director, it was not returned to his office and no benefit certificate was issued to Dr. Foster by any one in his office; that Dr. Foster did not become a member of the Society; that there was no record in his office showing such to be a fact; that, although, Dr. Foster had previously carried four benefit certificates with the defendant none of these was in force at the time of his death, on June 8, 1942; that notice of Dr. Foster's death was received, and it was explained to an attorney at Lexington, who had made an inquiry, claiming that the certificate had been issued upon the application, that the certificate had not been issued to Dr. Foster and that the application was cancelled by the medical director, for the reason that it was incomplete and, at that time, the attorney was advised that the $4.37 which had accompanied said application

would be returned to Dr. Foster's administratrix, upon the receipt of notice of her appointment and qualification.

The evidence shows that there was no tender of the $4.37 to any one until after this suit was filed, which, apparently, was a long time after the administratrix was appointed, when it was tendered to her and, also, to one of the attorneys for the plaintiffs. Tender was refused by both.

The medical director of defendant, testifying for it, stated that he received the application and examined it "but did not finally pass upon it because a specimen of urine was never furnished by the applicant as required."

It appears that, under the rules of the defendant, it was necessary for the report of the local examining doctor to be accompanied by a specimen of the urine of an applicant who had reached the age of Dr. Foster.

The witness further testified that, finding no specimen of urine of the applicant had been furnished, he wrote Dr. Montgomery, on May 22, 1942, so advising him, and notified him that he had written Dr. Foster requesting him to call at Dr. Montgomery's office and, on the same day, he wrote Dr. Foster advising him to call at Dr. Montgomery's office and furnish a specimen of his urine, as soon as possible and, on the same day, he wrote Mr. Manlove and asked him to have Dr. Foster call at the office of Dr. Montgomery; that again, on June 3, 1942, he wrote Mr. Manlove asking him to give this matter his prompt attention; that the witness never received a specimen of the urine after writing these letters; that the application was held in his file awaiting the specimen until June 10, 1942, when he was advised, by letter from Mr. Manlove, of the death of Dr. Foster, at which time, the application "was cancelled", and there was never any certificate issued upon the application.

Mr. Manlove, a witness for the defendant, testifying by deposition, stated that, he received the letters from the Medical Director; that he called Dr. Foster by telephone and saw him in person; that the first time he saw him he asked him "to get after it at once, and he said he would"; that the second time the doctor said "he would take care of it right away; said he had just neglected it".

He further testified that he was the financial secretary of defendant's local camp at the time, and that no certificate was ever forwarded to him from the home office; that he never delivered any certificate to Dr. Foster or anybody else in connection with Dr. Foster's application; that a certificate could not be delivered except through his office, under the laws of the defendant.

He further testified that he did not return to Dr. Foster the amount paid upon the application but that it was the duty of the head office in Omaha to return it; that the $4.37 paid to him by Dr. Foster represented one month's payment plus twenty-five cents local dues.

Defendant insists that the court erred in permitting plaintiffs' witness, Purnell, to testify concerning his conversation with Dr. Foster, relative to the delivery, to the latter, of the alleged certificate. We think this contention must be sustained. Declarations of this kind are admissible as illustrative of the main fact but not proof of it. "From the very nature of evidence admitted as part of the *res gestae,* there must be a main or principal fact." [22 C. J., p. 449.] "There must be a main or principal fact or transaction, and only such declarations are admissible which grow out of the principal transaction and serve to illustrate its character, and are contemporary with it and derive some degree of credit from it". [Jones on Evidence Civil Cases (4 Ed.), pp. 662, 663.] "Declarations standing by themselves are hearsay; there must be some main fact or act, which is itself admissible in evidence; declarations are admissible only in consideration of their bearing to such main fact or act certain relations." [Lund and Wife v. Inhabitants of Tyngsborough, 63 Mass. 36, 44.] "Minor matters which constitute the *res gestae* of a major subject are things so closely connected therewith as to be substantially involved therein and to explain or illustrate it. [Andrews v. United States C. Co., 154 Wis. 82, 142 N. W. 487.] It follows, as counsel for appellant contends, that there must be a material major circumstance in order that there be evidentiary *res gestae,* and that the latter are not, primarily, competent to prove the former." [Andrzejewski v. Northwestern Fuel Co., 158 Wis. 170, 175, 176. See, also, Ehrlinger v. Douglas, 81 Wis. 59, 62; Mitchum v. The State of Georgia, 11 Ga. 615, 622, 624; Huth v. Huth (Tex.), 30 S. W. 240; State v. Whitt, 113 N. C. 716; State v. Williams (La.), 32 So. 402.]

Plaintiffs contend that, if the evidence is sufficient to show a delivery of the certificate, a reasonable inference arises that it was properly issued by defendant under the constitution and by-laws of the defendant and, that, consequently, it became a binding contract of insurance between the defendant and Dr. Foster upon its delivery. It appears, then, that if the main or principal fact involved is not the delivery of the certificate, the main or principal fact was not proven by any testimony. Assuming that the delivery of the certificate is the main or principal fact, it follows that it cannot be proven by the declarations of Dr. Foster, under the authorities that we have cited, and the court committed error in permitting the introduction of Purnell's testimony on the subject.

There was no evidence of the delivery of the policy, outside of the declarations of Dr Foster to Mr. Purnell. The envelope that was found by the widow and the son-in-law of Dr. Foster, in the latter's office, is not shown to have had any connection with the alleged certificate. Mr. Purnell did not state that he saw any envelope in the of Dr. Foster. He said that the document shown him by Dr. Foster "was just folded sheets of paper together". There is an entire ab-

392

sence of any testimony that the envelope enclosed or was connected with the alleged certificate of insurance in question. It will be remembered that the Doctor had held four certificates of insurance with the defendant, any one of which, may have been enclosed by the envelope in question. It is true that plaintiffs' testimony shows that they did not find any old certificate (or, in fact, any) in the Doctor's office, yet, giving due weight to this circumstance, to say that the envelope enclosed the alleged certificate in question would be indulging in the rankest speculation.

We have examined Brownell v. The Pacific Railroad Co., 47 Mo. 239; Hopper v. Standard Life & Accident Ins. Co., 166 Mo. App. 209; Parr v. Ill. Life Ins. Co., 178 Mo. App. 155; Haines v. Chicago, R. I. & Pac. Ry. Co., 193 Mo. App. 453, and like cases cited by the plaintiffs, and find them not in point.

Defendant insists that its instruction in the nature of a demurrer to the evidence should have been given. In view of the fact that there was no competent evidence upon which a recovery in this case could have been based, defendant's contention must be sustained.

The judgment is reversed. *Cave, J.,* concurs.